## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MIANNA HOPKINS, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | Jury Trial Demanded |
| THE HARLEM GLOBETROTTERS | ) | |
| INTERNATIONAL, INC. a foreign corporation, | ) | |
| HERSCHEND ENTERTAINMENT STUDIOS, | ) | |
| LLC,  a foreign corporation, and HERSCHEND | ) | |
| FAMILY ENTERTAINMENT CORPORATION, | ) | |
| a foreign corporation. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT

Plaintiff Mianna Hopkins ("Hopkins"), by and through her undersigned counsel, brings this action to correct unlawful employment practices by Defendants The Harlem Globetrotters International, Inc. ("Globetrotters"), Hershend Entertainment Studios, LLC ("HES"), and Herschend Family Entertainment Corporation ("HFE") (collectively "Defendants").

## INTRODUCTION

1.      This is an action involving the violation of Hopkins' federal statutory rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII").

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

3.      Venue is proper is proper in the Northern District of Georgia under 28 U.S.C. § 1391 (b) (1) because all Defendants reside in the state of Georgia as well as this District; and (2) because a substantial part of the events or omissions giving rise to the claim occurred in this District; and/or (3) because the Globetrotters, HES, and/or HFE are headquartered in this District and are subject to personal jurisdiction in this District.

4.      In accordance with Title VII, Hopkins timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), received her Notice of Right to Sue, and timely files this Complaint. Thus, all conditions precedent to the institution of this lawsuit have been fulfilled.

## PARTIES

5.      The Globetrotters is a foreign corporation, registered in the state of Nevada, with a principal place of business located at 157 Technology Parkway, Suite 100, Peachtree Corners, Georgia 30092.

6.      The Globetrotters may be served via its registered agent, Stephen Earnest, at 157 Technology Parkway, Suite 100, Peachtree Corners, Georgia 30092.

7.      HES is a foreign corporation, registered in the state of Missouri, with a principal place of business located at 157 Technology Parkway, Suite 100, Peachtree Corners, Georgia 30092.

8.      HES may be served via its registered agent, Stephen Earnest, at 157 Technology Parkway, Suite 100, Peachtree Corners, Georgia 30092.

9.      HFE is a foreign corporation, registered in the state of Missouri, with a principal place of business located at 157 Technology Parkway, Suite 100, Peachtree Corners, Georgia 30092.

10.     HFE may be served via its registered agent, Stephen Earnest, at 157 Technology Parkway, Suite 100, Peachtree Corners, Georgia 30092.

11.     Defendants conduct business in this District.

12.     Hopkins is currently residing out of the country but, is expected to return to the United States shortly.

13.     At all relevant times, the Globetrotters was an "employer" within the meaning of Title VII in that it was engaged in an industry affecting commerce which had fifteen or more employees for each working day in each of twenty or more calendar weeks during the calendar years 2022 and/or 2023.

14.     At all relevant times, HES was an "employer" within the meaning of Title VII in that it was engaged in an industry affecting commerce which had fifteen

or more employees for each working day in each of twenty or more calendar weeks during the calendar years 2022 and/or 2023.

15.     At all relevant times, HFE was an "employer" within the meaning of Title VII in that it was engaged in an industry affecting commerce which had fifteen or more employees for each working day in each of twenty or more calendar weeks during the calendar years 2022 and/or 2023.

16.     Defendants had fifteen to 100 employees, including both part-time and full-time employees), in each of twenty or more calendar weeks, regardless of the number of days worked in the week, during the calendar years 2022 and/or 2023.

17.     Defendants had 101 to 200 employees, part-time and full-time, in each of twenty or more calendar weeks, regardless of the number of days worked, during the calendar years 2022 and/or 2023.

18.     Defendants combined had 201 to 500 employees, part-time and full-time, in each of twenty or more calendar weeks, regardless of the number of days worked, during the calendar years 2022 and/or 2023.

19.     At relevant times, Hopkins was an "employee" of Defendants within the meaning of Title VII.

20.     Hopkins is female.

21.     Hopkins demands a jury trial.

## FACTUAL ALLEGATIONS

22.   The Globetrotters own three exhibition basketball teams that tour worldwide.  It is made up of approximately thirty-three players each year.  Almost all of the players are male while in any given year, the Globetrotters may have one to four female players.

23.   HFE is the largest family-owned themed entertainment company in the United States.  HFE is the parent company for a family of entertainment brands that touts its "collective vision and mission of bringing families closer together" including theme parks, water parks, lodging, and sports entertainment.

24.   HES is HFE's in-house media arm.

25.   In 2013, HFE acquired the Globetrotters. HFE and HES are headquartered in Atlanta, Georgia. HFE is the parent company to the Globetrotters and the Globetrotters' content expansion was powered by HES which develops and produces hundreds of franchises of "wholesome entertainment worldwide for TV, film, publishing, licensing, and other media."

26.   HFE and HES maintained control of the Globetrotters.

27.   HFE and HES employ individuals to work at both the Globetrotters and HFE and HES.

28.   The Globetrotters and HFE and/or HES contracted with Hopkins a.k.a. "Mighty" in September, 2021, for one year to play on its international team.  The

Globetrotters renewed Hopkins' contract in July, 2022 to extend through August, 2023.

29.     From at least August, 2022 until approximately May, 2023, Hopkins was subjected to severe, pervasive sexual harassment, as both a hostile work environment and quid pro quo sexual harassment, by the team's Director of Scouting and General Manager, Al Clocker ("Clocker").   At all times relevant to this Complaint, Clocker was also the coach of the Globetrotters' international team.

30.     At all times relevant to the Complaint, Clocker was an employee of the Globetrotters and HES and/or HFE.

31.     At all times relevant to the Complaint, Clocker was Hopkins' superior and he held a position of power over her.

32.     At all times relevant to the Complaint, Clocker was in his seventies.

33.     At all times relevant to the Complaint, Hopkins was in her twenties.

34.     Clocker currently maintains his position of Director of Scouting and General Manager with the Globetrotters.  The Globetrotters has employed Clocker for almost twenty years.

35.     Clocker recruited Hopkins to play for the Globetrotters and he coached Hopkins on the Globetrotter's international team.  Clocker traveled with the team internationally and stayed at the same hotels as the team.

36.    Clocker routinely highly praised Hopkins for her basketball performance.

37.    However, Clocker also began repeatedly texting Hopkins that he loved her. He invited her to his hotel room for wine and he got angry when she did not spend time with him, sit next to him, or give him the attention he thought he deserved from her.

38.    Clocker made it clear to Hopkins that he wanted a romantic relationship with her and when she made it clear that she was not interested, Clocker repeatedly texted her that he was heartbroken over what could have been between them.

39.    Clocker texted that not loving Hopkins was the hardest thing that he had to do.

40.    Clocker told Hopkins that he was an agent for the Federal Bureau of Investigations (FBI).

41.    Upon information and belief, Clocker told other employees of the Globetrotters that he was in the FBI.

42.    Clocker told Hopkins that he was tracking her phone.

43.    Clocker told Hopkins that he was analyzing whether she was lying to him based upon her body language because he was trained to do that.

44.    Hopkins was terrified to tell anyone at the Globetrotters what Clocker was doing because she believed that he was in the FBI and was tracking her phone

and she believed that he would retaliate against her and destroy her dream of playing with the Globetrotters.

45.     Upon information and belief, Clocker is not nor has he ever been employed by the FBI.

46.     Clocker told Hopkins that he was in the FBI to scare her from complaining about him.

47.     Clocker told Hopkins that he was tracking her phone to scare her from complaining about him.

48.     During the relevant time period of this Complaint, Clocker told Hopkins that he spoke Vice President of Player Personnel and Tour Development, Barry Hardy ("Hardy") on her behalf related to her endeavors outside of the Globetrotters to ensure that she was in compliance with the Globetrotters' branding limitations.

49.     Additionally, Clocker told Hopkins that he engaged his personal lawyers to meet with the lawyer of the Globetrotters' parent company, HFE, on her behalf to ensure proper compliance with use of the Globetrotters' branding.

50.     After Hopkins refused Clocker's attempts at a personal romantic relationship, Clocker was very upset and said that he would miss the success and heights Hopkins "could have" achieved through having a relationship with him.

51.     Clocker told Hopkins that he did not feel like their relationship was "reciprocal."  Clocker felt like he did more for Hopkins than she did for him.

52.     Clocker told Hopkins that it was a mistake loving her.

53.     Clocker questioned Hopkins' loyalty to him.

54.     The entertainment provided by the Globetrotters is highly scripted and the routines were handed to the players by Clocker.

55.     On the international tours, Clocker did not give Hopkins a dribble sequence in her script.

56.     Over the relevant time period, Clocker regularly told Hopkins that she did not need to be able to perform a "slide dribble" because it was not in the "script" for her position/team.

57.     Only a few of the players on the international team are scripted to do the slide dribble.

58.     Most of the players on the international team cannot do the slide dribble.

59.     When a new female player joined the team, Hopkins heard one of the long-term female players tell another player to warn the new female player to "watch out for Al [Clocker]."

60.     It became clear to Hopkins that Clocker was well known for his inappropriate behavior toward female players.

61.     Hopkins learned that Clocker was treating another female player in a similar manner to the way he was treating her.

62.     During the relevant time period of this Complaint, including, but not limited to, the time periods in which the Globetrotters contracted with Hopkins to play basketball, Clocker engaged in sexual relations with at least one other employee of the Globetrotters and/or HEF and/or HES.

63.     During the time period that the Globetrotters have employed Clocker, he has engaged in sexual relations with female players.

64.     On the last day of the tour in May 2023 and the last time Hopkins saw Clocker, his last words to her were "you need to learn the slide dribble."  Hopkins was dumbfounded because this was in direct contradiction to what he had told her many times during her time with the Globetrotters.

65.     At no time prior to this statement by Clocker had Clocker or anyone else ever told Hopkins that she needed to learn the slide dribble.

66.     Then, in July, 2023, Hardy, who's his office is located in Atlanta, Georgia, and a Human Resources employee called Hopkins and told her that they were not renewing her contract for 2023-2024.  Hardy told Hopkins the non-renewal was based upon two reasons.

67.     One of the reasons Hardy gave was because he said Hopkins did not learn the slide dribble.

68.     During the relevant time period of this Complaint, most of the male players on the international team for whom Hopkins played cannot and/or do not perform the slide dribble in the performances at all.

69.     The player hired by the Globetrotters to replace Hopkins and/or take over her script(s), cannot perform the slide dribble.

70.     In July 2023, the Globetrotters did not terminate any other player on the basis that the player could not perform the slide dribble.

71.     In fact, no new player hired by the Globetrotters since July 7, 2023 has performed the slide dribble.

72.     No other player was terminated who held a position that did not perform the slide dribble from July 1, 2022 through June 30, 2023 and July 1, 2023 through June 30, 2024.

73.     The second reason that Hardy told Hopkins that the Globetrotters were not renewing her contract was because Hardy said she did not get approval for using a Globetrotters photo for her basketball camp flier.

74.     Hopkins explained to Hardy that she had absolutely received approval from the Globetrotters' marketing department for use of the photos.

75.     While speaking with Hardy, Hopkins tried to call a meeting to discuss Clocker's behavior but Hardy laughed at her and never set up a meeting with her.

76.    Prior to not renewing her contract, Hardy spoke with Clocker about her.

77.    Clocker spoke to Hardy about whether to renew players' contracts.

78.    Clocker and the Globetrotters retaliated against Hopkins for her refusal to engage in a personal, romantic relationship with Clocker by not renewing her contract in violation of federal law.

79.    Upon information and belief, Clocker has subjected other female players and employees currently and/or formerly with the Globetrotters and/or HEF and/or HES to sexual harassment.

80.    Upon information and belief, the Globetrotters and/or HEF and/or HES knew that Clocker subjected female basketball players to sexual harassment and/or had a sexual relationship with them.

81.    Upon information and belief, coach "Sweet" Lou Dunbar knew that Clocker subjected female basketball player to sexual harassment and/or engaged in sexual relations with female basketball players.

## COUNT ONE: SEXUAL HARASSMENT

82.    Hopkins incorporates by reference herein the preceding paragraphs of this Complaint.

83.    The Globetrotters, HES, and HEF have a duty to maintain a work environment free of sex discrimination and harassment.

84.     The Globetrotters, HES, and HEF's action and inaction created a hostile and offensive work environment and interfered with Hopkins' work.

85.     The Globetrotters, HES, and HFE knew or should have known of the hostile work environment and failed to take prompt remedial action reasonably calculated to end the harassment. failing to take action reasonably calculated to prevent sex discrimination and harassment on the basis of sex, and by permitting a work environment to exist that was hostile and offensive to Hopkins on the basis of her sex.

86.     The Globetrotters, HES, and HFE further violated federal law by not renewing Hopkins' contract when she declined Clocker's quid pro quo offer to engage in a personal romantic relationship with him in exchange for his offers of conditional job opportunities based on his sexual requests.

87.     As a direct and proximate result of the Globetrotters, HES, and HFE's actions and inactions, Hopkins has suffered damages.

88.     At all times material hereto, the Globetrotters, HES, and HFE engaged in a discriminatory practice with malice or reckless indifference to the federally protected rights of Hopkins so as to support an award of compensatory and punitive damages.

89.     The above-described acts of the Globetrotters, HES, and HFE constitute sexual harassment and discrimination in violation of Title VII.

90.     Hopkins is entitled to an award of back pay and benefits, front pay, compensatory damages, punitive damages, injunctive relief, reinstatement, attorney's fees and costs, and all other appropriate damages, remedies, and other relief available under the Title VII.

91.     As a result of the discriminatory acts, Hopkins has suffered and will continue to suffer damages.

## COUNT TWO: DISCRIMINATION ON THE BASIS OF SEX

92.     Hopkins incorporates by reference herein the preceding paragraphs 1 through 81 of this Complaint.

93.     The Globetrotters, HES, and HFE violated Title VII when it terminated Hopkins for failing to perform the slide dribble when most of the male players cannot perform it and were not terminated.

94.     The Globetrotters, HES, and HFE treated Hopkins unfavorably on the basis of her sex.

95.     Hopkins is entitled to an award of back pay and benefits, front pay, compensatory damages, punitive damages, injunctive relief, reinstatement, attorney's fees and costs, and all other appropriate damages, remedies, and other relief available under the Title VII.

96.     As a result of the discriminatory acts, Hopkins has suffered and will continue to suffer damages.

## COUNT THREE: RETALIATION

97.     Hopkins incorporates by reference herein the preceding paragraphs 1 through 81 of this Complaint.

98.     In violation of Title VII, the Globetrotters, HES, and HFE retaliated against Hopkins for refusing to engage in a romantic relationship with Clocker.

99.     Prior to May, 2023, the Globetrotters, HES, and HFE never told Hopkins that her job performance was deficient in any way.  She was qualified for the position.

100.    Had Hopkins agreed to the romantic relationship with Clocker, the Globetrotters, HES, and HFE would not have retaliated against her by refusing to renew her contract.

101.    The Globetrotters, HES, and HFE did not have a legitimate non-retaliatory reason to not to renew Hopkins' contract.   The only reason the Globetrotters, HES, and HFE did not renew her contract was because she refused Clocker's offers of a personal romantic relationship.

102.    The aforementioned acts constitute unlawful practices pursuant to Title VII.

103.    The effect of the practices complained of above was to deprive Hopkins of equal employment opportunities and otherwise adversely affect her status as an employee because of her sex.

104.   Hopkins is entitled to an award of back pay and benefits, front pay, compensatory damages, punitive damages, injunctive relief, reinstatement, attorney's fees and costs, and all other appropriate damages, remedies, and other relief available under the Title VII.

105.   As a result of the discriminatory and retaliatory acts, Hopkins has suffered and will continue to suffer damages.

106.   The Globetrotters, HES, and HFE acted willfully toward Hopkins with actual malice or with reckless disregard of the protected rights of Hopkins so as to support an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Hopkins respectfully prays for judgment in her favor in the form of an Order of this Court:

A.   Awarding Hopkins damages including, but not limited to, front pay, back pay, lost wages, bonuses, and all other employment benefits to be determined at trial;

B.   Awarding Hopkins reinstatement.

C.   Awarding Hopkins punitive damages;

D.   Awarding Hopkins compensatory damages;

E.   Awarding Hopkins reasonable attorney's fees and expenses;

F.   Awarding Hopkins any further relief permitted under law; and

G.     Awarding Hopkins any further relief as the Court deems just and

proper.

Respectfully submitted this 4th day of June, 2024.

By:     Kimberly N. Martin
        Kimberly N. Martin
        kimberlymartinlaw@gmail.com
        Georgia Bar No. 473410
        Thomas F. Martin
        tfmartinlaw@msn.com
        Georgia Bar No. 482595

        MARTIN & MARTIN, LLP
        Post Office Box 1070
        Tucker, Georgia 30085